**UNITED STATES of America,
Plaintiff,**

v.

**COLONIAL PIPELINE COMPANY,
INC., Defendant.**

**No.  CIVA1:00–CV–3142–JTC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 23, 2002.

---

**23.**  There is no diversity of citizenship under 28 U.S.C. § 1332 because all the parties were Delaware corporations.

Gwendolen Fitz–Henley, Gregory R. Tan, U.S. Environmental Protection Agency Office of Regional Counsel, William Duffey, U.S. Attorney, Lisa D. Cooper, Assistant U.S. Attorney, Office of the U.S. Attorney Northern District of Georgia, Atlanta, GA, Anna C. Thode, Lois J. Schiffer, Cynthia S. Huber, Scott D. Bauer, Environmental Enforcement Section Land & Natural Resources U.S. Department of Justice, Catherine M. Rojko, Christy L. King, Cheryl T. Rose, Amy R. Gillespie, Drenaye L. Houston, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, DC, for Plaintiff.

W. Ray Persons, King & Spalding, Robert Elling Hogfoss, Matthew James Calvert, Rita Arlene Sheffey, Lawrence J. Bracken, II, Steven I. Addlestone, Hunton & Williams, Atlanta, GA, Robert R. Merhige, Hunton & Williams, Richmond, VA, David F. Geneson, Hunton & Williams, Washington, DC, Jo Ann Harris, White Plains, NY, for Defendant.

## *ORDER*

CAMP, District Judge.

Plaintiff, the United States of America through the Environmental Protection Agency, seeks injunctive relief and civil penalties pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq,* against Defendant, Colonial Pipeline Company, for alleged discharges of oil into the navigable waters and adjoining shorelines of the United States. Presently pending before the Court are the following motions: Plaintiff's Motion for Partial Summary Judgment on Defendant's Fifth and Sixth Defenses [# 58–1] and Defendant's corresponding Cross Motion for Partial Summary Judgment on Plaintiff's Second and Third Claims for Relief [# 66–1]; Plaintiff's Motion for Partial Summary Judgment as to Defendant's Liability [# 74–1] and Defendant's corresponding Cross Motion for Partial Summary Judgment as to Defendant's Scope of Liability [# 78–1]; and Defendant's Motion for Partial Summary Judgment as to Imminent and Substantial Threat and Mootness [# 85–1].

## I. Background

The undisputed facts taken from Defendant's Response to Plaintiff's Statement of Undisputed Material Facts are as follows: Defendant operates an underground pipeline that consists of more than 5,300 miles of pipe extending from Texas to the New York Harbor traversing at least twelve other states in between. In an average day Defendant's pipeline system carries more than 80 million gallons of oil and other petroleum products from Texas to New Jersey. When discharged from a point source into navigable waters, the petroleum products transported in Defendant's pipeline are "pollutants" within the meaning of Section 502(6) of the CWA. Plaintiff alleges approximately twenty different spills in violation of the CWA by Defendant.

## II. Statement of the Law

The Clean Water Act (CWA) was created by Congress to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a). Pursuant to § 301 of the CWA, it is unlawful for a party to discharge pollutants unless such discharge has been authorized through a permit program. 33 U.S.C. § 1311. The enforcement mechanism for § 301, section 309, allows the Administrator to either issue a compliance order or bring a civil action, against any person in violation of § 301 or in violation of a permit condition. 33 U.S.C. § 1319(a)(3). If the Administrator chooses to bring a civil action, the Administrator may seek "appropriate relief, including a permanent or temporary injunction..." 33 U.S.C. § 1319(b).

An additional provision of the CWA, section 311, makes it unlawful to discharge oil or hazardous substances into the navigable waters and adjoining shorelines of the United States. 33 U.S.C. § 1321(b)(3). The enforcement mechanism for § 311 allows the Attorney General to secure any relief as may be necessary to abate endangerment when the President has determined that there may be an imminent and substantial threat to the public health or welfare of the United States because of an actual or threatened discharge of oil or a hazardous substance in violation of subsection (b). 33 U.S.C. § 1321(e). The President has delegated the authority to make such determinations to the Administrator in such cases as this one involving inland zones. *See* Exec. Order No. 12,777, 56 Fed.Reg. 54,577 (1991).

## III. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The district court should 'resolve all reasonable doubts about the facts in favor of the non-movant,' ... and draw 'all justifiable inferences ... in his favor ....'" *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991). The court may not weigh conflicting evidence nor make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1993), *rh'g denied,* 16 F.3d 1233 (1994)(en banc).

As a general rule, "[the] party seeking summary judgment always bears the ini-

tial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the moving party's responsibility varies depending upon which party bears the burden of proof at trial on the issue in question.

For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (quoting *Four Parcels,* 941 F.2d at 1437–38).

On the other hand, when the non-moving party bears the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim. Instead, the moving party may simply point out to the district court that there is an absence of evidence to support the non-moving party's case on the issue in question. *Id.* at 1115–16. Of course, the moving party may offer evidence to affirmatively negate a material fact upon which the non-movant has the burden and which is essential to its claim. In either case, the

non-moving party may not rely upon allegations or denials in the pleadings, but instead must respond with sufficient evidence to withstand a directed verdict motion at trial. Fed.R.Civ.P. 56(e); *Hammer v. Slater,* 20 F.3d 1137, 1141 (11th Cir. 1994) (citing *Fitzpatrick,* 2 F.3d at 1116–17).

## IV. Analysis

### A. Plaintiff's Motion for Partial Summary Judgment as to Defendant's Fifth and Sixth Defenses [# 58–1] and Defendant's Cross Motion for Partial Summary Judgment as to Plaintiff's Second and Third Claims for Relief [# 66–1]

These motions raise the issue of what relief Plaintiff may seek. Defendant makes the following three arguments: (1) Plaintiff may not seek relief under § 309 as this section applies only to uses in violation of permits, not accidental oil spills that would never be permitted; (2) Plaintiff may not seek injunctive relief under § 311(e) because relief under this section is limited to clean up and removal; and (3) Plaintiff may not seek the injunctive relief demanded in the complaint because pursuant to the Pipeline Safety Act (PSA), 49 U.S.C. § 60101, this type of relief is within the jurisdiction of the United States Department of Transportation, Office of Pipeline Safety.

### i. Relief Under § 309

Defendant argues that Plaintiff may not seek relief under § 309 because this section applies only to uses in violation of permits, not accidental oil spills that would never be permitted. Defendant further asserts that § 311 is the exclusive remedy

under the CWA for oil spills. Plaintiff, on the other hand, asserts that Defendant violated § 301 by discharging pollutants and therefore Plaintiff is authorized to bring a civil action against Defendant under § 309. In other words, Plaintiff denies that § 311 is the exclusive remedy for oil spills.

Section 309(b) authorizes the Administrator to commence a civil action for any violation that occurs for which the Administrator would be authorized to issue a compliance order under § 309(a). 33 U.S.C. § 1319(b). In pertinent part § 309(a) states:

> Whenever on the basis of any information available to him the Administrator finds that any person is in violation of [§ 301]...of this title, or is in violation of any permit condition...he shall issue an order requiring such person to comply with such section or requirement, or he shall bring a civil action in accordance with subsection (b) of this section. 33 U.S.C. § 1319(a)(3).

Section 301 prohibits "[e]xcept as in compliance with this section...the discharge of any pollutant..." 33 U.S.C. § 1311(a).

Defendant asserts that the provisions contained in § 301(a) relate to permits or permit requirements, and accordingly, being in violation of § 301(a) means being in violation of a permit condition or failure to have an available permit. In the case of discharges for which no permit is available, such as an oil spill, Defendant asserts that § 311 is the exclusive and appropriate enforcement mechanism. *See* 33 U.S.C. § 1321(b)(3) (making it unlawful to discharge oil or hazardous substances into the navigable waters of the United States).

Defendant's argument has the appeal of simplicity in that it draws a very distinct rule, permit violations are enforced through §§ 301/309 and oil spills are enforced through § 311. However, the meaning of legislation is determined by the intent of Congress which is very seldom simple.

Looking first at the plain text of the CWA, Defendant cites to nothing in § 301 or § 309 stating that it does not apply to oil spills. Likewise Defendant cites to nothing in § 311 stating that this section is the sole remedy for oil spills. There is a section, however, specifying that a violation may not be subject to civil penalties under both § 311 and § 309. *See* 33 U.S.C. § 1313(g)(6)(A). If the Court were to accept Defendant's argument, this provision would be unnecessary. *See United States of America v. Texaco Exploration & Production, Inc.,* 2:98–CV–0213S, 4–5 (C.D.Utah May 27, 1999)(unpublished). The Court also notes that under Defendant's argument, § 309(a) would be redundant, as it states that it applies when any person is in violation of § 301 *or* in violation of any permit condition. Defendant argues that these are one in the same, thereby making "or in violation of any permit condition" superfluous. Lastly the Court notes that § 301 states that it shall be unlawful for "any person" to discharge pollutants in a manner not in compliance with this section, not that it is unlawful for any "permittee" to do so. *See Texaco Exploration,* 2:98–CV–0213S at 5.

In support of its argument Defendant cites to legislative history and the dialogue surrounding amendments to the CWA made in 1978. In 1978, Congress amended the "harmful quantity" test utilized in § 311, which defines prohibited releases of oil. The amendments made excluded several types of discharges all involving permitted activities. Defendant asserts that

excluding permit violations from the scope of § 311 supports its argument that § 311 is the exclusive remedy for oil spills, leaving § 301/309 for permit violations. Though the 1978 amendments limited the types of discharges that could be brought under § 311, the amendments did not limit or alter what could be brought under §§ 301/309. *See Marathon Oil Co. v. United States Environmental Protection Agency,* 97–CV–267–D, 11–12 (D.Wyo. Aug. 20, 1998) (unpublished). In other words, though the amendments established that permit violations could not be brought under § 311, they did not establish that oil spill violations could not be brought under § 309.

Though floor comments made by Senator Stafford, a principal sponsor of the bill, support Defendant's argument that there was at least some intent in amending the CWA to distinguish between § 301/309 violations and § 311 violations, the Court does not find that these comments support restricting the CWA in a manner not set out in the statute. *See* 124 Congressional Record 37683 (1978) ("... we are attempting to draw a line between the provisions of the act under sections 301, 304, 402 regulating chronic discharges and 311 dealing with spills...The concept can be summarized by stating that those discharges of pollutants that a reasonable man would conclude are associated with permits, permit conditions, the operation of treatment technology and permit violations would result in 402/309 sanctions; those discharges of pollutants that a reasonable man would conclude are episodic or classical spills not intended or capable or being processed through the permitted treatment system and outfall would result in the application of section 311").

The issue raised by Defendant was addressed prior to the 1978 amendments in *United States v. Hamel,* 551 F.2d 107 (6th Cir.1977). Though *Hamel* involved criminal sanctions brought under § 309, the defendant made the same argument, that the government should have proceeded against him under § 311 for his gasoline spill instead of § 309. Addressing the fact that § 311 explicitly defines the term "oil", the *Hamel* Court stated "we do not believe that specificity of definition alone indicates that § [311] was intended to be the sole Congressional expression on oil discharges." *Hamel,* 551 F.2d at 111. The Court further found that § 311 was not the exclusive remedy for oil spills. *Hamel,* 551 F.2d at 112. After the 1978 amendments two district courts, in unpublished opinions, have reached the same conclusion. *See Marathon Oil Co. V. United States Environmental Protection Agency,* 97–CV–267–D, 11–12 (D.Wyo. Aug. 20, 1998) (unpublished); *United States of America v. Texaco Exploration & Production, Inc.,* 2:98–CV–0213S, 4–5 (C.D.Utah May 27, 1999)(unpublished).

■ For the above reasons, the Court finds that this case was appropriately brought under § 309. In making this determination, the Court notes that treating sections 309 and 311 as alternatives in the case of oil spills furthers the purpose behind the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

### ii. Injunctive Relief Under 311(e)

Defendant argues that the relief sought by Plaintiff under § 311(e) is inappropriate as (1) no Court has been asked to interpret this provision and (2) relief under the provision is limited to clean up and removal.

The language of § 311(e) states that when there has been a determination that

an "imminent and substantial threat to the public health or welfare of the United States" exists "because of an actual or threatened discharge of oil or a hazardous substance from a vessel in violation of subsection (b)...the President may-re-quire the Attorney General to secure any relief from any person, including the own-er or operator of the vessel or facility; as may be necessary to protect the public health and welfare." 33 U.S.C. § 1321(e).

■ First the Court notes that the absence of published case law interpreting litigation of a statute does not negate the ability to seek relief under such statute. Further, the argument that relief under § 311(e) is limited only to clean up and removal is meritless as the section covers not only actual discharges, but threatened discharges. It goes without saying that a threatened discharge, which has not yet occurred, cannot be cleaned up and re-moved. The statute plainly authorizes "any relief" when certain circumstances are met. Defendant has given the Court no reason to find that this language was meant to exclude the injunctive relief sought by Plaintiff.

### iii. Injunctive Relief/Jurisdiction of PSA

Defendant argues that Plaintiff may not seek the injunctive relief demanded in the complaint because pursuant to the Pipeline Safety Act (PSA), 49 U.S.C. § 60101, this type of relief is within the jurisdiction of the United States Department of Trans-portation, Office of Pipeline Safety. The specific injunctive relief sought by Plaintiff is that Defendant be required to take all appropriate action to prevent future dis-charges of oil into navigable waters, and specifically that Defendant take specific measures as set forth in the Spill Preven-tion Plan for Category 1 and 2 Pipeline. *Pl.'s Complaint pg. 14.*

The Spill Prevention Plan consists of a series of prescriptive operation, mainte-nance, and testing requirements that would apply for several years across Colo-nial's entire pipeline system. Defendant asserts that this type of relief is left to the PSA which has directed the Department of Transportation ("DOT") to prescribe safe-ty standards for the "design, installation, inspection, emergency plans and proce-dures, testing, construction, extension, op-eration, replacement, and maintenance of pipeline facilities." *See* 49 U.S.C. § 60102(a)(1)(B).

Both § 309 and § 311 allow Plaintiff to seek injunctive relief for violations of § 301 and § 311 respectively. The scope of appropriate injunctive relief cannot be determined until and if liability is estab-lished and a hearing on the appropriate relief has been conducted. Defendant's argument as to the relief sought by Plain-tiff actually goes to the scope of injunctive relief which the Court at present cannot and will not determine. The Court notes, however, that it will not ultimately grant injunctive relief that does nothing but re-peat what is already required by the PSA, nor will the Court allow Plaintiff to exer-cise powers granted to the Department of Transportation Office of Pipeline Safety and not delegated to Plaintiff by Congress.

For the above stated reasons, Plaintiff's Motion for Partial Summary Judgment [# 58–1] as to Defendant's fifth defense, that "[t]he relief sought in the Com-plaint...is unavailable to the United States under the federal Clean Water Act", and Defendant's sixth defense, that "[t]he United States, and in particular the U.S. Environmental Protection Agency, lacks jurisdiction to seek the relief de-

manded in the Complaint," is **GRANTED**. Defendant's Cross Motion for Partial Summary Judgment [# 66–1] as to Plaintiff's second claim for relief, asking that Defendant be subjected to injunctive relief pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and Plaintiff's third claim for relief, asking that Defendant be subjected to injunctive relief pursuant to Section 311(e) of the CWA, 33 U.S.C. § 1321(b), is **DENIED**.

**B. Plaintiff's Motion for Partial Summary Judgment as to Defendant's Liability [# 74–1] and Defendant's Cross Motion for Partial Summary Judgment on Defendant's Scope of Liability [# 78–1]**

In these motions, Plaintiff seeks summary judgment as to Defendant's liability for injunctive relief under § 301(a) and § 309(b) of the CWA for twenty individual discharges of pollutants into waters of the United States. Plaintiff also seeks summary judgment as to Defendant's liability for civil penalties under § 311(b) of the CWA for six (6) discharges of pollutants into waters of the United States. For four of the six discharges, Plaintiff requests a factual finding as to the minimum number of barrels discharged. Defendant does not dispute that it is liable as to civil penalties for the six discharges alleged by Plaintiff, however, Defendant seeks summary judgment as to the scope of liability for such discharges. More specifically, Defendant asserts that it is liable for the amount of pollutant discharged that reached navigable water and adjoining shorelines as opposed to the entire amount of pollutant released into the environment. In addition, Defendant opposes summary judgment being granted against Defendant as to injunctive relief for the twenty spills alleged by Plaintiff.

**i. Background**

In June of 1996, a segment of Defendant's pipeline ruptured resulting in an unpermitted discharge of 957,600 gallons of diesel fuel into the Reedy River in Simpsonville, South Carolina. The Reedy River is a navigable water within the meaning of Section 502(7) of the CWA. This discharge caused a film or sheen upon or a discoloration of the surface of the Reedy River. The discharge caused a violation of applicable water quality standards. On February 25, 1999, Defendant and the United States entered into a plea agreement with respect to the Reedy River Spill. As part of the plea agreement, entered by the United States District Court for the District of South Carolina, Defendant agreed to the terms of a P & D Program.

Defendant does not dispute the following unpermitted discharges of pollutants: (1) April 23, 1996–discharge of 1,386 gallons of gasoline into the environment, some of which entered an unnamed creek and its adjoining shoreline near Blacksburg, South Carolina. The unnamed creek is a navigable water within the meaning of § 502(7) of the CWA, the discharge caused a film or sheen upon or a discoloration of the surface of the creek, and caused a violation of applicable water quality standards. (2) May 17, 1996–discharge of gasoline into an unnamed creek and its adjoining shoreline near Greensboro, North Carolina. The unnamed creek is a navigable water within the meaning of § 502(7), the discharge caused a film or sheen upon or a discoloration of the surface of the creek, and caused a violation of applicable water quality standards. (3) May 30, 1997–discharge of 18,900 gallons of gasoline into the environment some of which entered an unnamed creek and its adjoining shoreline near Ath-

ens, Georgia. The unnamed creek is a navigable water within the meaning of § 502(7), the discharge caused a film or sheen upon or a discoloration of the surface of the creek, and caused a violation of applicable water quality standards. (4) December 2, 1997–discharge from a segment of pipe in St. Helena Parish, Louisiana of 420,000 gallons of gasoline into the environment, some of which reached Darling Creek. This creek is a navigable water within the meaning of § 502(7), and the discharge caused a film or sheen upon or a discoloration of the surface of the creek. (5) February 9 and 10, 1999–discharge of 53,550 gallons of fuel oil, some of which entered Goose Creek and the Tennessee River in Knoxville, Tennessee. These waters are navigable within the meaning of § 502(7), and the discharge caused a film or sheen upon or a discoloration of the surface of the waters. (6) May 19, 2000— discharge of kerosene and sheen of about 40 feet by 40 feet in a pond near Greensboro, North Carolina. This pond is navigable within the meaning of § 502(7).(7) July 20, 1993–discharge of gasoline into a tributary of Long Green Creek near Hydes, Maryland. This tributary is navigable within the meaning of § 502(7).(8) December 19, 1991–discharge of more than 500,000 gallons of fuel oil into Durbin Creek and adjoining shorelines near Greenville County, South Carolina. This creek is navigable within the meaning of § 502(7).(9) September 21, 1990–discharge of oil into the environment some of which entered an unnamed stream near Powder Springs, Georgia. The stream is navigable within the meaning of § 502(7).(10) June 22, 1990–discharge of 84,000 gallons of fuel oil into an unnamed private pond and its adjoining shorelines near Chesterfield, Virginia. This pond is navigable within the meaning of

§ 502(7).(11) May 20,1990–discharge of 5,600 gallons of gasoline into the environment some of which entered Clifty Creek and the Little Sequachie River between Grundy and Marion County, Tennessee. These waters are navigable within the meaning of § 502(7).(12) January 5, 1988– discharge of about 100,000 gallons of fuel oil into the environment some of which entered the Woodbury Creek near Deptford Township, New Jersey. This creek is navigable within the meaning of § 502(7).(13) November 8, 1985–discharge of approximately 120,800 gallons of fuel oil into the environment some of which entered the James River near Chesterfield, Virginia. This river is navigable within the meaning of § 502(7).(14) April 5, 1985–discharge of approximately 168,000 gallons of gasoline into the environment some of which entered Clear Prong and Yellow Leaf Creek near Shelby County, Alabama. These waters are navigable within the meaning of § 502(7).(15) March 6, 1980–discharge of 336,000 gallons of aviation grade kerosene into the environment some of which entered the Bull Run River and one of its tributaries near Manassas, Virginia. These waters are navigable within the meaning of § 502(7).(16) March 6, 1980–discharge of approximately 92,000 gallons of fuel oil into the environment some of which entered a tributary of Mine Run near Locust Grove, Virginia. This tributary is navigable within the meaning of § 502(7).(17) December 18, 1989–discharge of approximately 212,000 gallons of kerosene into the environment some of which reached the Rapidan and Rappahannock Rivers near Locust Grove, Virginia. These waters are navigable within the meaning of § 502(7).(18) March 28, 1993–discharge of approximately 407, 736 gallons of fuel oil into the Sugarland Run and Potomac Riv-

er near Reston, Virginia. These waters are navigable within the meaning of § 502(7).(19) Sometime in 1976 some soil was contaminated as a result of pipe leakage in Barrow County, Georgia. This resulted in contamination of ground water flowing toward two small streams. This leakage resulted in gasoline traveling through soil or ground water to unnamed navigable tributaries of Barber creek.

### ii. Injunctive Liability

Plaintiff seeks summary judgment as to Defendant's liability for permanent injunctive relief. Defendant asserts that Plaintiff has not established the elements necessary to gain a permanent injunction. Though Plaintiff has established the ability to succeed on the merits, as Defendant does not dispute that it has discharged pollutants into navigable waters, Plaintiff has not established irreparable harm. Plaintiff contends that where a statute authorizes injunctive relief and such statute is violated, irreparable harm may be presumed. In other words, Plaintiff argues that evidence of irreparable harm is not required in this instance to establish Defendant's liability for a permanent injunction. The case law Plaintiff cites in support of this proposition relate to racial discrimination in violation of fair housing statutes and Title VII. *See United States v. Hayes Int'l Corp.*, 415 F.2d 1038 (5th Cir.1969); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir.1984).

■ The United States Supreme Court has made clear that district courts are not "mechanically obligated to grant an injunction for every violation of the law." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The *Weinberger* court found more specifically that the CWA did not require a dis-

trict court to grant injunctions for all violations of the act but instead the CWA "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act." *Id.* at 320, 102 S.Ct. 1798. In *Weinberger* and *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), both cases involving violations of environmental statutes, the Supreme Court reversed the granting of preliminary injunctions that were given without considering irreparable harm or a balance of the equities. Discussing the requirement of irreparable harm for an injunction, the Eleventh Circuit has stated that "[e]nvironmental litigation is not exempt from this requirement." *United States v. Lambert*, 695 F.2d 536, 540 (1983). Considering these cases, it appears that the Court may not determine permanent injunctive liability under the CWA without a showing of irreparable injury, inadequacy of legal remedy, and a balancing of the equities. *Natural Resources Defense Council v. Texaco Refining and Marketing Inc.*, 906 F.2d 934 941 (3rd Cir.1990).

■ Defendant asserts that Plaintiff cannot show irreparable injury because the injury Plaintiff complains of, the discharge of pollutants into the Nation's waters, has been abated. Defendant asserts that since the implementation of the P & D program Defendant has had few spills, and none in the years 2000 and 2001. Though the Court recognizes that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable", in this instance without any evidence as to irreparable harm or inadequacy of remedy the Court will not grant summary judgment as to

Defendant's permanent injunctive liability. *Amoco Production,* 480 U.S. at 545, 107 S.Ct. 1396.

### iii. Scope of Liability for Civil Penalties

Plaintiff seeks summary judgment as to Defendant's liability for civil penalties under § 311(b) of the CWA for six (6) discharges of pollutants into waters of the United States. Defendant does not dispute that it is liable as to civil penalties for the six discharges alleged by Plaintiff, however, Defendant seeks summary judgment as to the scope of liability for such discharges. The six discharges at issue are (1) the Reedy River spill in Simpsonville, South Carolina, (2) the April 23, 1996 discharge near Blacksburg, South Carolina into an unnamed creek, (3) the May 17, 1996 discharge into an unnamed creek near Greensboro, North Carolina, (4) the May 30, 1997 discharge into an unnamed creek near Athens, Georgia, (5) the February 9 and 10, 1999 into Goose Creek and the Tennessee River in Knoxville, Tennessee, and (6) the May 19, 2000 discharge of kerosene and a sheen of about 40 feet by 40 feet in a pond near Greensboro, North Carolina.

Section 311(b)(3) of the CWA states that "[t]he discharge of oil or hazardous substances (I) into or upon the navigable waters of the United States, adjoining shorelines...in such quantities as may be harmful as determined by the President under paragraph (4) of this subsection, is prohibited..." 33 U.S.C. § 1321(b)(3). Section 311(b)(7) which provides for civil penalties states that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of para-

graph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged." 33 U.S.C. § 1321(b)(7).

Defendant asserts that according to the above provisions it is liable for civil penalties only for the amount of oil or hazardous substance discharged into or upon navigable waters or adjoining shorelines, because it is only liable for oil discharged "in violation of paragraph (3)." Plaintiff asserts that Defendant is liable for the entire amount of oil or hazardous substance released into the environment because the penalty paragraph does not include the limiting phrase "navigable waters and adjoining shorelines." Neither party cites to case law, and the Court has been unable to find any, in support of either position.

■ From a plain reading of the statute, it appears that Plaintiff has the better argument. Though § 311(b)(3) requires that the oil be discharged into or upon the navigable waters and adjoining shorelines of the United States for a violation to take place, the penalty provision does not include the same limiting language. It states more or less, that when oil has been discharged in violation of paragraph 3, a civil penalty will be assessed in an amount up to $1,000 per barrel of oil discharged. The penalty provision does not say per barrel of oil *discharged into or upon the navigable waters and adjoining shorelines.* "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *quot-*

*ing United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972). Though the Court recognizes Defendant's desire to limit the scope of its liability, the Court does not read the statute in such a limiting manner. Because the Court finds that any penalty to be assessed is to be based upon the entire amount of oil or hazardous substance released into the environment, it is unnecessary to address Defendant's arguments regarding the definitions of adjoining shoreline and navigable water.

For the above stated reasons, Plaintiff's Motion for Partial Summary Judgment as to Defendant's Liability [# 74–1] is **GRANTED in part and DENIED in part**. It is **GRANTED** as to Defendant's liability for civil penalties and **DENIED** as to Defendant's injunctive liability. Defendant's Cross Motion for Partial Summary Judgment as to Defendant's Scope of Liability [# 78–1] is **DENIED**.

### C. Defendant's Motion for Partial Summary Judgment as to Imminent and Substantial Threat and Mootness [# 85–1]

Defendant moves the Court to grant summary judgment as to Plaintiff's claims for injunctive relief. Defendant makes several arguments as to why Plaintiff's claims for injunctive relief should be dismissed. First Defendant argues again that § 311 applies only to the clean up and removal of spills as opposed to pipeline systems. As the Court found previously in this Order, relief under § 311(e) is not limited only to clean up and removal of discharges as the section covers not only actual discharges, but threatened discharges.

Defendant also asserts that the injunctive relief sought by Plaintiff has become moot due to new regulations issued by the Office of Pipeline Safety and Defendant's legal requirements under the P & D Program. In making this argument Defendant divides the injunctive relief sought by Plaintiff into six categories: (1) an inventory or waters; (2) on the ground surveys; (3) right of way maintenance; (4) internal inspection; (5) corrosion control; and (6) leak detection. Defendant addresses each category and explains how the relief sought by Plaintiff in that category is either already mandated by OPS regulations and/or the P & D program, or is in contrast with OPS regulations and/or the P & D program.

Plaintiff responds to Defendant's arguments by first asserting that the fact that OPS regulations and the P & D program mandate certain procedures is irrelevant because Defendant has failed to follow such procedures. Plaintiff then goes on to point out, within each of the six categories, how the relief sought differs from the action mandated by the OPS regulations and the P & D program.

This is an extremely fact intensive question that is inappropriate for determination on summary judgment. In addition, as already noted, the scope of appropriate injunctive relief cannot be determined until and if liability is established and a hearing on the appropriate relief has been conducted.

Lastly Defendant argues that Plaintiff's claims for injunctive relief should be dismissed because there is no administrative record to support Plaintiff's determination of an imminent and substantial threat, and that Plaintiff used an improper standard in making such determination. More specifically, Defendant argues that though a determination was made, as required by Sec-

tion 311, it was improper because it is not supported by an administrative record, and further that pursuant to 5 U.S.C. § 703 an administrative record is necessary because Plaintiff's determination is subject to judicial review as this is a civil proceeding for judicial enforcement.

Plaintiff asserts that a determination was made and that whether the Court accepts the facts upon which the determination was made and concludes that an injunction should be imposed is a matter for trial. Plaintiff further asserts that it is not required to compile an administrative record, and points out that Defendant cites to nothing which imposes such a requirement on Plaintiff.

■ Based on the following analysis the Court rejects Defendant's argument. In the Supreme Court case *Federal Trade Commission v. Standard Oil Co. of California,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), the Supreme Court found that a complaint, issued by the Federal Trade Commission (FTC) to Standard Oil, which stated that the FTC had "reason to believe" that Standard may be violating Section 5 of the Federal Trade Commission Act (FTCA) and set a date for further hearing, was not a final agency action. Under Section 5 of the FTCA the FTC had authority to issue a complaint when it had reason to believe that the act was being violated. 15 U.S.C. § 45(c).

Standard brought suit against FTC asserting that the FTC did not have sufficient reason to believe that Standard was in violation of the FTCA and sought review of the initial complaint. *Standard,* 449 U.S. at 235, 101 S.Ct. 488. The Supreme Court found that the complaint was not reviewable because it was not final action, but instead was a "threshold determination that further inquiry is warranted." *Id.* at 241, 101 S.Ct. 488. The Court noted that the complaint had no legal force nor did it have any direct effect on Standard. *Id.* at 243, 101 S.Ct. 488. The Court stated that "the averment of reason to believe is a prerequisite to a definitive agency position on the question whether [Standard] violated the Act, but itself is a determination only that adjudicatory proceedings will commence." *Id.* at 241, 101 S.Ct. 488. In support of its position the Court also noted that if it were to intervene at this point there would be piecemeal review and the ultimate question of whether the FTCA had been violated would be delayed. *Id.* at 242, 101 S.Ct. 488.

The authority given to the FTC under the FTCA to issue a complaint when it has reason to believe that the law is being violated is very similar to the Plaintiff's authority under Section 311 of the CWA to make a determination that there *"may* be an imminent and substantial threat to the public health or welfare of the United States... because of an actual or threatened discharge of oil or a hazardous substance..." 33 U.S.C. § 1321(e)(1) (emphasis added). Also like the FTC complaint, the determination issued by Plaintiff has no legal effect or force on Defendant and is nothing more than a determination that because there may be a threat further adjudication is warranted. Though the determination is a prerequisite to further action, the determination itself is not "final."

Despite the above similarities, once the complaint or determination has been issued, differences arise. After the FTC complaint was issued further adjudicatory proceedings were to be conducted by the agency itself as opposed to the Court. 15

U.S.C. § 45. As a result the *Standard* court found that the initial complaint could be reviewed when the final action taken by the agency was reviewed. *Standard,* 449 U.S. at 245, 101 S.Ct. 488. The Court rejected the argument that allowing the adjudication to proceed would deny Standard adequate review of the initial complaint because the reviewing court would lack an adequate record to review since the record would contain information about the final order and not the initial complaint. *Id.* at 244–45, 101 S.Ct. 488. The Supreme Court found that the reviewing court would have the power to review both the final order and the initial complaint and that an inadequate record "can be made adequate." *Id.* at 245, 101 S.Ct. 488.

In regards to Plaintiff, once the determination is issued, Congress has given the EPA two choices: (1) the EPA may conduct further proceedings and take final action in the form of an administrative order, in which case, like *Standard,* the determination would be reviewed at the time the order was reviewed; or (2) the EPA may surrender its authority to take final action and instead leave any final determination for the trial court. *See* 33 U.S.C. § 1321(e)(1)(A) and (B). In either instance Defendant is protected by the judicial process and the question of whether Section 311 has been violated is not delayed. There is no reason to believe that the alleged inadequate record in this case could not be made adequate, as suggested in the *Standard,* through evidence and witness testimony. *Standard,* 449 U.S. at 245, 101 S.Ct. 488.

Because the determination issued by Plaintiff has no legal force nor does it directly effect Defendant, the determination is simply a finding that further adjudication is warranted. Congress has given Plaintiff the discretion to choose whether it will take final action or whether it will leave any final determinations to the trial court. Plaintiff has chosen the latter. Though it is not entirely clear whether Plaintiff is required to keep a record as to its initial determination, Defendant will still be protected by the judicial process as any inadequacies in the record may be made adequate during trial.

For the above stated reasons, Defendant's Motion for Summary Judgment as to Imminent and Substantial Threat and Mootness [# 85–1] is **DENIED**.

## V. Conclusion

Plaintiff's Motion for Partial Summary Judgment [# 58–1] as to Defendant's fifth and sixth defenses is **GRANTED**. Defendant's Cross Motion for Partial Summary Judgment [# 66–1] as to Plaintiff's second and third claims for relief is **DENIED**.

Plaintiff's Motion for Partial Summary Judgment as to Defendant's Liability [# 74–1] is **GRANTED in part and DENIED in part**. It is **GRANTED** as to Defendant's liability for civil penalties and **DENIED** as to Defendant's injunctive liability. Defendant's Cross Motion for Partial Summary Judgment as to Defendant's Scope of Liability [# 78–1] is **DENIED**.

Defendant's Motion for Summary Judgment as to Imminent and Substantial Threat and Mootness [# 85–1] is **DENIED**.

Plaintiff's Motion to Extend [# 75–1] and Defendant's Motion to Extend [# 82–1] are **GRANTED**. Defendant's Motion for Oral Argument [# 82–2] is **DENIED**.